--- NOT FOR PUBLICATION ---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHARON VARGAS,<br>　　　　　Plaintiff, | CIVIL ACTION |
| v. | |
| COMPUTER SCIENCES CORPORATION,<br>　　　　　Defendant. | NO. 16-2824 |

## MEMORANDUM OPINION

Remaining in this employment discrimination case is Plaintiff Sharon Vargas's claim that her former employer, Defendant Computer Sciences Corporation ("CSC"), retaliated against her in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA").[1] 28 U.S.C. §§ 4311(b), (c)(2). CSC has filed a motion for summary judgment, which shall be granted for the reasons outlined herein.

I.   **Background**

Vargas served in the United States Army on active duty from 1972 to 1991, and on temporary duty due to a disability from 1991 to 1995, at which time she retired with a rank of master sergeant. JA 29, 32, 36.

On February 14, 2011, Vargas was hired by the software testing company AppLabs as the Assistant Vice President of Human Resources based in its Philadelphia office. Joint Appendix ("JA") 65-67, 73-78, 80-81, 379. CSC is a software company headquartered in Falls Church,

---

[1] On September 12, 2016, the parties jointly stipulated to the dismissal of Plaintiff's claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and her corresponding claims under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 *et seq.* ECF No. 16. On December 22, 2016, the Court granted Defendants' motion to dismiss Plaintiff's Title VII and PHRA race discrimination claims as time-barred pursuant to 42 U.S.C. § 2000e-5(f)(1) and 43 Pa. Stat. § 959(h). ECF No. 24. In her response to the instant motion, Plaintiff voluntarily withdrew her USERRA disparate treatment claim, ECF. No. 38 at 4, and so summary judgment will be entered in Defendant's favor with respect to the USERRA claim insofar as it alleges disparate treatment in violation of 28 U.S.C. §§ 4311(a), (c)(1).

Virginia.[2]  On September 14, 2011, CSC purchased AppLabs.  JA 447.  For approximately one year thereafter, AppLabs continued to operate as an independent entity, and Vargas continued in the same position, overseeing all human resources functions at AppLabs from the Philadelphia office.  JA 68, 70, 103, 104, 438-39, 449.  This continued until around January 2013, when CSC began to integrate AppLabs into its existing corporate structure.  JA 119, 449.  According to Ira Katz, a Human Resources Manager, AppLabs was integrated into the Global Business Services and Regions ("GBS") division  and the Global Applications business unit.  JA 449.  The integration process lasted until the end of March 2013.  JA 118, 449.  During the integration, Vargas continued to work at CSC until April 12, 2013, when she was terminated.  JA 214, 452.

The sole remaining claim in this case turns on the events that preceded her termination, and specifically, whether Vargas's termination constituted unlawful retaliation under USERRA.  In support of its motion, CSC relies on affidavits submitted by Katz and two other CSC employees.  The summary judgment record does not include any depositions by Vargas of CSC employees, nor is there any documentary evidence in the record that pertains to the integration and reorganization process described by the CSC employees.

According to the CSC employees, the decision to terminate Vargas was the culmination of a structured reduction in the overall CSC workforce.  JA 436-54.  Lisa O'Lalde – a CSC employee since January of 2000, who is currently a Manager in Employment Compliance – indicates that on August 30, 2012, she learned that CSC had decided to undergo reorganization as a cost-saving measure, and was assigned to work on the team managing the reorganization.  JA 436.  As O'Lalde describes it, the reorganization proceeded according to a plan recommended by the Boston Consulting Group to "identify inefficiencies in the management structure" by

---

[2] On April 1, 2017, CSC merged with and into DXC Technology Company, of which it is now a wholly-owned subsidiary.  ECF No. 36, at 1 n.1.

reducing middle management. JA 437. Generally, this "delayering" process required the company to proceed from the highest levels of management downward. JA 437-38. At each level, the manager(s) would identify all the employees who reported to them, and then decide which positions could be eliminated by consolidating two or more existing employees' responsibilities into a single position. *Id.* They also recommended which of the employees who reported directly to them to retain in the consolidated position(s), and which to terminate. JA 438. After these recommendations were reviewed by "CSC leadership and legal," they were "finaliz[ed] and implement[ed]" for a given level. *Id.* The process was then repeated at each successive level of management. *Id.* According to Katz, "CSC decided that any employee laid off in the de-layering [reduction in force] would be ineligible for rehire for a year following discharge," and no exceptions were made to this general policy. JA 451. CSC's rationale for the no-rehire policy was to prevent its managers from undoing the reorganization by immediately rehiring laid-off employees. *Id.*

O'Lalde further explains that the reorganization of Levels 1, 2 and 3 was completed in September of 2012. JA 439. Layer 1 consisted solely of the Chief Executive Officer. JA 438. The only Layer 2 employee in the Human Resources Department was the Executive Vice President of Human Resources, who oversaw eight Layer 3 employees. JA 439. One of these was Archana Singh, the Vice President of Human Resources for GBS. *Id.* Vargas was a Layer 4 employee who was mapped to report to Singh following the integration of AppLabs into GBS. JA 442. The reorganization of Level 4 took place in October of 2012. JA 439. O'Lalde indicates that on October 19, 2012, she received the Layer 4 staffing file, which included Singh's decisions with respect to the employees who were mapped to report to her. JA 442. Vargas was one of two employees Singh had selected for elimination. JA 442-43. The rationale given was

3

that following the transition, AppLabs would not need its own Human Resources manager because those responsibilities would be handled by the business unit into which it was absorbed. JA 443.

Singh did not, however, select Vargas for immediate termination.[3] *Id.* Instead, Singh selected Vargas to be placed in a "talent pool." O'Lalde explains that employees in the talent pool continued to work in their existing position without being informed of the decision. JA 440. Managers at successive levels who "identified a position for which they did not have an appropriate candidate" would then be able to select from individuals in the talent pool. *Id.*

At the time Vargas was placed in the talent pool on October 19, 2012, CSC intended to terminate the employment of all individuals in the talent pool if they had not been placed in another position by the time the delayering process was complete. JA 440. However, that changed by "mid-November 2012" when CSC decided to terminate, effective December 12, 2012, every employee in the talent pool "who had not already been matched to specific Layer 4 or 5 positions." JA 441. At the time, 121 people – 118 of whom were Layer 4 employees – were in the talent pool. JA 441. The rationale given for this decision was motivated in part by CSC's conclusion that there were "few to no" remaining positions due to the restructuring process, and also because CSC was concerned that retaining people from the talent pool would undermine its objective of cutting costs. *Id.* Nonetheless, according to Katz, "[m]anagement requested and received permission to delay Vargas's discharge date until after the AppLabs transition" to assist with the integration process. JA 451-52. As a result, Vargas's "layoff date was extended until March 30, 2013 and then April 12, 2013."[4] JA 452.

---

[3] In contrast, the other of Singh's direct reports that she selected for termination, David Piowowar, was terminated on or about October 31, 2012. JA 443, 444, 446.

[4] It is neither clear who requested and approved Vargas's extensions, nor when either extension decision was made.

Vargas testified that she was not formally notified of the decision to terminate her employment until March 26, 2013, when she received a phone call from Rex Miller, a CSC Human Resources manager. JA 221. However, that testimony is not inconsistent with the general description of CSC's reorganization process outlined above. Moreover, Vargas's description of their conversation corroborates CSC's account, as he informed her that although he had thought he would be able to keep her on in the Global Mobilization team, she "wasn't available to pick up." JA 328.

Despite the absence of any formal notification of CSC's decision to terminate her employment, Vargas had become concerned about her future at CSC, so she began making inquiries about her future with CSC in late 2012, raising questions through various channels as to whether her veteran status would factor into restructuring decisions. The first conversation reflected in the record took place on November 7, 2012, when Vargas "verbally informed Archana Singh that she was a protected veteran." JA 539. She raised similar concerns again some time in December of 2012 – although nothing in the record indicates what was said, or to whom. JA 291-92. Additionally, in January or February of 2013, Vargas raised her concerns to Rich Taylor, head of GBS Americas Human Resources. JA 205. Finally, between March 15 and her last date of employment, she continued to raise concerns with Taylor, Katz, and Stephanie Weaver, an attorney in CSC's legal department. JA 203-27.

In several of the communications that took place in March and April of 2013, Vargas specifically informed several CSC managers she believed she was protected by the Vietnam Era Veterans Readjustment Assistance Act ("VEVRRA"), 38 U.S.C. § 4211, *et seq.*, and its implementing regulations, 41 C.F.R. §§ 60-300 and 60-741. Before her termination, Vargas also raised concerns that her position had been replaced by a non-veteran, and that non-veterans were

5

being placed in positions that she believed she was qualified for, and should have received instead. JA 228-33, 410.

## II. Legal Standard

"[S]ummary judgment is appropriate where there is 'no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010)(quoting Fed. R. Civ. P. 56(c)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252 (3d Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). Material facts are those which "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rick Univ. State Sys. Of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). In deciding a motion for summary judgment, "the reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

## III. Discussion

"Congress enacted USERRA in 1994 to, *inter alia*, 'encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service.'" *Carroll v. Delaware River Port Auth.*, 843

6

F.3d 129, 131 (3d Cir. 2016) (quoting 38 U.S.C. § 4301(a)(1)). To that effect, its antidiscrimination provision states that:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).

USERRA also includes an anti-retaliation provision, under which Vargas's sole remaining claim proceeds. It states in pertinent part that, "[a]n employer may not . . . take any adverse employment action against any person because such person . . . has taken an action to enforce a protection afforded any person under [USERRA]." 38 U.S.C. § 4311(b)(1). Furthermore, "[an] employer shall be considered to have engaged in actions prohibited [by the anti-retaliation provision] if the person's . . . action to enforce a protection afforded any person under [USERRA] . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action." 38 U.S.C. § 4311(c)(2).

By its plain terms, then, USERRA creates a two-step burden shifting framework that "differs starkly from the familiar *McDonnell-Douglas* three-step framework used in most employment discrimination cases." *Murphy v. Radnor Twp.*, 542 F. App'x 173, 177 n.3 (3d Cir. 2013). First, an employee bears the "initial burden of showing . . . that the employee's military service was a substantial or motivating factor in the adverse employment action." *Carroll*, 843 F.3d at 131 (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (interpreting analogous USERRA antidiscrimination causation provision at 38 U.S.C. § 4311(c)(1)). Second, "[i]f this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer

7

would have taken the adverse action anyway, for a valid reason." *Id.*; *see also Gagnon v. Sprint Corp.*, 284 F.3d 839, 853 (8th Cir. 2002) (noting that the burden shifting framework *Sheehan* sets out under the antidiscrimination provision at 38 U.S.C. § 4311(c)(1) applies equally to the analogous anti-retaliation provision at 38 U.S.C. § 4311(c)(2)). Thus, unlike retaliation under *McDonnell-Douglas*, where the burden of persuasion remains on the employee, under USERRA, once the employee makes out a *prima facie* case of retaliation by showing that her action to enforce a USERRA protection was a motivating factor for an adverse employment action, the burden shifts to the employer to prove the affirmative defense that the adverse action would have been taken despite the employee's protected activity.

Here, the undisputed facts inexorably lead to the conclusion that Vargas cannot make out a *prima facie* case of USERRA retaliation. As an initial matter, the parties agree that Vargas suffered an "adverse employment action" within the meaning of 38 U.S.C. § 4311(b) when CSC terminated her employment. Where they differ is 1) with respect to whether she engaged in USERRA protected activity, and 2) whether there is sufficient evidence from which the requisite causal relationship between the protected activity and her termination could be inferred. These questions are interrelated. Because Vargas lacks any direct evidence of retaliatory motive harbored by any CSC decision makers, she argues that the decision to terminate her employment was made in a "temporal proximity unusually suggestive of retaliatory motive" to her USERRA protected activity sufficient to suggest a retaliatory motive. *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (citation omitted). To resolve this question, it is necessary to first determine when CSC made the decision to terminate Vargas's employment, and second, which conversations – if any – preceded that decision.

There is no genuine dispute that the decision to terminate Vargas's employment, and to not consider her for placement in any other CSC position for at least one year thereafter, was made in mid-November of 2012 when CSC decided to lay off all 121 employees still remaining in the talent pool. The affidavits submitted by CSC employees establishing this timeline for the reduction in the overall CSC workforce are not contradicted by Vargas's deposition testimony. Nor, as Vargas contends in her response to the instant motion, are there inconsistencies in the CSC employee affidavits that would create a genuine issue as to when the decision was made.[5]

With that timeline established, the analysis is straightforward: Vargas can only establish a *prima facie* USERRA retaliation claim if she engaged in protected activity before mid-November of 2012 when CSC decided to eliminate the talent pool. As has been seen, nearly all of the communications where Vargas expressed concern about her veteran status to CSC management took place between December of 2012 and April of 2013. Even if these conversations were USERRA protected activity, they cannot serve as the basis for Vargas's USERRA retaliation claim because they happened after CSC decided to terminate her employment.

The record does, however, contain evidence of a single conversation that preceded the decision to terminate the talent pool when, on November 7, 2012, Vargas "verbally informed Archana Singh that she was a protected veteran." CSC contends generally that Vargas's requests that CSC take affirmative steps to consider her veteran status in deciding whether her position would be selected for elimination do not constitute "action[s] to enforce a protection afforded any person under [USERRA]," 38 U.S.C. § 4311(b)(1), because USERRA (unlike VEVRAA)

---

[5] Vargas's contention in opposition to the instant motion that CSC's decision to require Vargas to complete an employment application in January of 2013 creates an inconsistency from which a retaliatory motive can be inferred lacks merit. The record shows otherwise: CSC'S employee affidavits provide a general description of the transition of AppLabs into CSC's existing infrastructure in which existing AppLabs employees were required to complete human resources paperwork so that their integration into CSC's systems could be completed. JA 164. Plaintiff does not contend that she was singled out for a different process.

9

does not require affirmative action, but rather, proscribes disparate treatment of protected veterans. For her part, Vargas responds that it does not matter whether she was legally correct in her expressed belief that CSC's consideration (or lack thereof) of her protected veteran status, was a USERRA violation, so long as she raised her concerns in a manner that could "reasonably be interpreted as asserting some protected right" under USERRA.

However, the Court need not resolve the parties' dispute as to whether Vargas's November 7, 2012, conversation with Singh constituted USERRA protected activity because even assuming that it was, the circumstances of the conversation are such that the temporal proximity is not, in and of itself, unusually suggestive of retaliatory motive given that the decision to terminate her employment was the result of a policy that applied to all similarly situated CSC employees. There is no evidence in the record from which a jury could reasonably conclude that that the decision to lay off the entire talent pool – a decision that, by all accounts, was uniformly applied to all 121 employees it affected – was in any way motivated by Vargas's November 7 conversation with Singh. Neither is there anything to suggest that Singh was involved with the decision to lay off the talent pool, nor is there evidence that the individuals who were responsible for the decision to lay off the talent pool were aware of the conversation. Accordingly, Vargas is unable to establish that her USERRA protected activity was a motivating factor for CSC's decision to terminate her employment. For this reason, she cannot make out a *prima facie* case, and summary judgment will be granted in favor of CSC on her USERRA retaliation claim. An appropriate order follows.

**DATED: July 10, 2017**　　　　　　　　　　　**BY THE COURT:**

　　　　　　　　　　　　　　　　　　　　　　　/s/Wendy Beetlestone, J.

　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　**WENDY BEETLESTONE, J.**